THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* PHILLIP J. KENNING, Defendant-Appellee.

Fifth District   No. 81—214

Opinion filed October 28, 1982.—Rehearing denied November 23, 1982.

John R. Clemons, State's Attorney, of Murphysboro (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Randy E. Blue and Susan A. Diehl, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The defendant, Phillip Kenning, was involved in an automobile accident in Carbondale, Illinois, on November 9, 1980. He was taken to Memorial Hospital in Carbondale for treatment of a laceration on his head and he was interviewed by Carbondale police at the emergency room. In addition, police obtained his signature on a form releasing his medical records to police and on a form authorizing a blood-alcohol test. The defendant was subsequently charged in the circuit court of Jackson County with driving while under the influence of intoxicating liquor and illegal transportation of alcoholic liquor. His pretrial mo-

tions to suppress his oral statements and the results of his blood test were granted and the State appeals pursuant to Supreme Court Rule 604(a) (85 Ill. 2d R. 604(a)).

At the suppression hearing, Carbondale Police Officer Charles Collier testified that when he arrived at the hospital, the defendant was resting on a cot in the emergency room. The officer said that he asked the defendant to sign the release of medical records form and the blood-alcohol test authorization. Collier testified that he started to read the release of records form aloud, but the defendant insisted that he could read the form himself. The officer also testified that he read the blood test authorization form to the defendant. According to Collier, he never told the defendant that the results of the blood test could be used against him in court. He did not tell the defendant that he had the right to speak with an attorney, nor did he warn the defendant that he had the right to have a separate blood test administered by a physician of his choice. The officer further failed to mention that there was a legal presumption of intoxication that could be used against him in court.

Collier recalled that the defendant was not under arrest when he signed the forms. He stated that he told the defendant that a blood-alcohol test was a "requirement" and that the police "like" to take such tests whenever there is a serious accident. Additionally, Collier testified that the defendant's girlfriend, Ms. Annette Teubert, read the consent and release forms to the defendant, told him he should sign the forms and pointed out the lines for the signatures.

Ms. Teubert's version of the events differed from that given by Officer Collier. She testified that she saw a nurse hand Collier a clipboard with papers on it. However, she stated that he refused to tell her what the papers were, refused to let her read them, refused to let the defendant read them and refused to read them aloud to the defendant. Ms. Teubert testified that the officer told the defendant that the forms were mandatory. She said that he explained to her that the forms were required because a pedestrian injured in the accident might die and because the pedestrian was being taken out of State, to St. Louis, for treatment.

Ms. Teubert recalled that because the defendant was not wearing his eyeglasses she tried to read the consent and release forms to him three times, but was interrupted twice by Officer Collier and once by a nurse. Eventually, she testified, Collier escorted her from the room. Collier denied doing so. She returned to the room because she feared that the officers were "deceitfully" trying to "force" the defendant to sign the papers. Ms. Teubert explained that she had spoken earlier to

her father, an attorney, and he advised her that the defendant should be cautious about signing any documents that could be used against him in court. However, the defendant signed the documents despite his girlfriend's warnings, explaining to her that the papers were required in order to take the injured pedestrian out of State.

Michelle Pitchell-Freimuth, who drove Annette Teubert to the hospital, testified that while she was sitting in the waiting room, she saw Officer Collier escort Ms. Teubert out of the emergency room. Ms. Pitchell-Freimuth stated that she later talked to the defendant in his hospital room, and he maintained that it was necessary for him to sign the forms because the injured pedestrian was being taken out of State. He informed her that his girlfriend should not be upset about his signing the papers.

When the defendant took the witness stand, he explained that the laceration on his head had required eight to 10 stitches and several smaller cuts had also required attention. Because of these wounds, his head had been partially shaved and a local anesthetic had been administered prior to treatment. According to the defendant, he was dizzy, groggy and "not all there" when he spoke with police. He testified that the officer told him that he was required to sign the forms because of the possibility that the injured pedestrian might die and because the pedestrian was being transferred out of State. He testified that his recollection was somewhat unclear, but he believed that the forms he signed were required by the hospital. The defendant stated that he was not informed that he had the right not to sign the forms, that the information could be used against him in court, that he could consult with an attorney or that he was suspected of a crime. The defendant also stated that he was severely nearsighted and could not see past six inches without his eyeglasses.

Carbondale Police Officer Charles Doan, who helped interview the defendant at the emergency room, was unable to corroborate much of Officer Collier's testimony. At the suppression hearing he stated repeatedly that his memory of events was incomplete. He testified that he could not recall whether the defendant was wearing glasses over his bandages, whether Ms. Teubert ever left the room, whether she read the forms or told the defendant not to sign them, or whether the defendant asked if he could consult with an attorney or have his glasses. Doan also stated that he could not remember if the defendant had been informed that he had to sign the forms because they were routine in serious accidents when an injured person is transferred out of State. In addition, he could not recall whether Collier told the defendant that he was suspected of driving while intoxicated, whether

either officer told the defendant that he had the right to refuse the blood test, whether he told the defendant that the results of the test could be used against him in court, whether the defendant was told the tests were for police, not hospital, use, or whether the defendant was told that he could consult a lawyer. Doan could not remember whether either officer gave the defendant the admonitions required before a person may consent to a breath test, or any similar advice. Although Officer Doan did recall that he noted the odor of alcohol on the defendant's breath at the accident scene, he stated that that fact did not create any suspicions in his mind that the defendant was driving while intoxicated.

The trial court noted that the police officers had each testified that at the time of the auto accident, there was an odor of alcohol on the breath of the defendant. Therefore, the court found that the defendant had already been suspected of driving while under the influence of intoxicating liquor and that because "a custodial situation was indicated," the oral statements made by the defendant without receiving *Miranda* warnings should be suppressed. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The court stated that to hold otherwise would allow the *Miranda* rule to be circumvented.

In ruling on the blood-alcohol test consent, the court emphasized that credible testimony showed that the police told the defendant that the forms pertained to hospital business and not to a criminal investigation. In addition, the court observed that it was uncontroverted that the defendant had recently received treatment for his head injury and had been given a local anesthetic, and the defendant had testified that he was dizzy and groggy at the time. Because the forms were signed so soon after the accident and the medical treatment, and because testimony showed that the defendant was mislead by police, the trial court held that the State had not shown that the consent for the blood test was voluntary and therefore the results of the test were also ordered suppressed.

The State's first contention on appeal is that the trial court erred in suppressing oral statements the defendant made at the hospital. The State asserts that the questioning by police at the hospital was noncustodial in nature and *Miranda* warnings were therefore not required. Custodial interrogations exist when police initiate questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) The warnings are not required when the defendant was neither

under arrest, nor led to believe he was under arrest. *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711.

■■ The trial court held that a custodial situation existed here because the defendant was already suspected of a crime since the officers smelled alcohol on his breath. However, *Miranda* warnings are not required merely because the person being questioned is suspected by the police of criminal conduct. (*Oregon v. Mathiason*.) Moreover, since the testimony at the suppression hearing showed that neither the defendant nor police believed he was in custody, there was no custodial interrogation. Instead, there was only general questioning at the hospital following the accident and *Miranda* warnings were not required. Accordingly, the defendant's oral statements were erroneously suppressed. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Clark* (1977), 55 Ill. App. 3d 496, 371 N.E.2d 33.

■■ The State's second contention is that the trial court erroneously suppressed the results of the defendant's blood-alcohol test as being obtained without the defendant's voluntary consent. Compulsory blood tests do not violate an individual's constitutional rights merely because he objects to such tests. (*Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826.) Illinois, however, has adopted a statutory provision which requires the exclusion of blood tests results obtained without the defendant's consent. (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501(c)(3); *People v. Todd* (1975), 59 Ill. 2d 534, 322 N.E.2d 447.) Under the standard of *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041, section 11—501(c)(3) of the Illinois Vehicle Code requires only that the consent be voluntary, not that it be "knowing and intelligent." (*People v. Lentini* (1982), 106 Ill. App. 3d 695, 435 N.E.2d 1280; *People v. Cook* (1981), 94 Ill. App. 3d 73, 418 N.E.2d 457.) The voluntariness of the consent is a question of fact to be determined from all the circumstances, and the subject's knowledge of a right to refuse is only one factor to be taken into account in establishing whether the consent was voluntary. *Schneckloth v. Bustamonte*.

■■ Here, the trial court made a finding of fact that the defendant's consent for testing of his blood was not voluntary. It is well accepted that it is the trial court's function to determine the credibility of the witnesses and a reviewing court will not overturn the trial court's findings unless they are contrary to the manifest weight of the evidence. (*People v. Huffner* (1981), 99 Ill. App. 3d 516, 425 N.E.2d 603.) The defendant in the case at bar testified that the automobile accident had caused a serious laceration on his head and a local anesthetic had been required. He recalled that he was told by po-

lice that signing the forms was mandatory. The defendant's girlfriend testified that when she demanded to read the forms she was physically escorted from the room, and her friend in the waiting area observed her being escorted from the room. When the friend later spoke with the defendant in his room, the defendant explained his belief that signing the documents was mandatory. But most importantly, the other police officer at the scene was unable to provide substantial corroboration for his partner's testimony that the defendant was not misled about the nature of the forms. Based on this evidence, we cannot conclude that the trial court's findings were against the manifest weight of the evidence.

■ Without the defendant's consent, found absent by the trial court, the results of the blood-alcohol tests are inadmissible against the defendant. (*People v. Williams* (1981), 103 Ill. App. 3d 876, 431 N.E.2d 1280; *People v. Weissinger* (1980), 90 Ill. App. 3d 700, 413 N.E.2d 497; *People v. Wheatley* (1972), 5 Ill. App. 3d 827, 284 N.E.2d 353.) We therefore affirm the order of the circuit court of Jackson County which suppressed the results of defendant's blood test, and reverse the order which suppressed the oral statements made by defendant at the emergency room. This cause is remanded for further proceedings.

Affirmed in part, reversed in part, remanded.

KARNS, P.J., and JONES, J., concur.