THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN A. ROMANO, Defendant-Appellant.

Second District    No. 83—0471

Opinion filed December 31, 1985.

REINHARD, J., dissenting.

G. Joseph Weller and Michael F. Braun, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Sally A. Swiss, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:
Defendant John Romano was charged by indictment on August 3, 1982, with the offense of reckless homicide and was convicted after a seven-day jury trial. On appeal, defendant contends the trial court committed reversible error by admitting the results of a chemical analysis performed on his blood because the sample was not handled properly and because he did not consent to the blood test, and also erred in allowing the admission of his statements at the hospital because he was in custody, but received no *Miranda* warnings. Finally, defendant argues the trial court erred in allowing the jury to hear the

testimony of the State's accident reconstruction expert prior to striking that testimony. We affirm.

The accident involving defendant and which resulted in the death of Brett Motisi occurred at approximately 5:35 p.m. on July 23, 1982, in Kane County. Both defendant and his brother, Tom Romano, spent the afternoon of July 23 at a friend's house. At approximately 4:30 p.m. defendant followed his brother by car back to their parent's home, arriving at approximately 5 p.m. Intending to return to the friend's house, defendant again followed his brother, each in a separate car, eastbound on Bowes Road. Defendant moved into the oncoming lane of traffic to pass his brother, and his car struck Brett, who was traveling by bicycle with westbound traffic on the north side of Bowes Road. Brett's mother, Karen Motisi, was also struck by defendant's car. The victim's sister, Kimberlee Motisi, who was also riding a bicycle, was not injured.

Upon arriving at the accident scene, Kane County Deputy Sheriff Eugene F. Heppler observed the two injured persons and then defendant, who was standing in the driveway of a nearby house. Because defendant appeared injured, Heppler sought medical attention for him and then continued his investigation at the accident scene.

Defendant was transported by ambulance to the emergency room of St. Joseph's Hospital in Elgin. Heppler arrived at the hospital a short time later, introduced himself again to defendant and asked him to describe the accident. After taking defendant's statement, Heppler ticketed defendant for the offense of driving under the influence, requested that he submit to a blood test and advised him from a card of the provisions of the implied consent statute. According to Heppler and Barbara Oberg, an emergency room nurse, defendant consented to the blood test. Heppler also recited to defendant his *Miranda* rights. Defendant then signed a form in which defendant authorized release of information which Heppler then countersigned. Oberg swabbed the area from which blood was withdrawn with distilled water, drew two vials of blood, dated and signed the vials and took possession of them. Heppler transported defendant to the Kane County jail.

Defendant was indicted for the offense of reckless homicide. He pleaded not guilty and requested a jury trial. The State proceeded to trial on a bill of particulars which alleged that the acts constituting recklessness by defendant included speeding, driving under the influence of alcohol, changing lanes with bicyclists on the shoulder, and driving in the oncoming lane of traffic. Defendant made two pretrial motions: to suppress his statements made at the hospital and to ex-

clude from evidence results of a blood alcohol test. At a hearing on November 4 and 10, 1982, the trial court heard testimony and arguments and then denied both motions.

At the commencement of defendant's trial, defendant made a motion *in limine* requesting that the State be precluded from introducing any testimony or making any reference to any statements or reports of an accident reconstruction expert. The court denied the motion. As its case in chief, the State presented numerous witnesses including Heppler, Oberg, and several eyewitnesses to the accident.

Principally to establish the chain of custody and the handling of blood-alcohol samples following the accident, the State also introducted the testimony of a Kane County deputy sheriff, several employees of the Illinois Department of Law Enforcement (IDLE), and a chemist for the Illinois Department of Public Health (IDPH) who performed the blood-alcohol test on defendant's blood. The State also presented the testimony of Thad Aycock, a senior consultant at Northwestern University Traffic Institute, who testified based upon certain information supplied to him by the sheriff's department that at the point defendant applied his brakes, he was traveling at a minimum speed of 78 miles per hour. Defendant thereafter filed a motion to strike Aycock's testimony, which the trial court subsequently granted prior to the close of evidence. Accordingly, the court instructed the jury to disregard Aycock's testimony.

The defense case included two of defendant's friends who testified defendant was sober just prior to the accident and defendant's brother who, because he was in another car at the scene when the collision occurred, offered testimony regarding the details of the accident. Defendant also gave his version of the accident and testified he had consumed at least two beers that day. As evidence of the proper techniques and procedures for the storage and evaluation of blood when blood alcohol tests will be performed, defendant presented the testimony of Dr. Michael Schaffer, chief toxicologist for the office of the medical examiner of Cook County, and in rebuttal on the same subject, the State called Dr. Jeorg Pirl, assistant chief toxicologist of the IDPH.

Following testimony from the last witness, a registered nurse, the jury returned a verdict of guilty. The trial court on February 10, 1983, sentenced defendant to a term of three years imprisonment. On March 8, 1983, defendant filed a post-trial motion containing 18 assignments of error which the trial court denied on April 4, 1983. Defendant filed a timely notice of appeal that same day.

■ Defendant first contends the trial court erred in admitting

into evidence defendant's blood alcohol test results. Specifically, defendant contends the blood samples and test results were admitted improperly because certain provisions of the Standards and Procedure for Testing for Alcohol and/or Other Drugs (Standards) of the Illinois Department of Public Health as provided for in section 11—501.2 were not satisfied (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2).

The provisions of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501 *et seq.*) are implicated if three requirements of the statute are satisfied. First, the provisions concerning implied consent including the Standards are applicable only if the motorist is first arrested for an offense as defined in section 11—501. (Ill. Rev. Stat. 1983, ch. 95½, pars. 11—501.1, 11—501.2.) Here, defendant was arrested for DUI prior to the blood test.

The second requirement is that the blood test be administered at the request of a law enforcement officer (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.1; *People v. Durbin* (1985), 138 Ill. App. 3d 895, citing *People v. Murphy* (1985), 108 Ill. 2d 228, 234.) This requirement is satisfied on these facts for Heppler testified he requested that defendant submit to the blood test.

The third requirement of the statute is that the subsequent criminal prosecution *arise out of* an arrest for an offense as defined in section 11—501. (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2.) Recently, our supreme court considered the meaning of this third requirement. (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2; *People v. Murphy* (1985), 108 Ill. 2d 228.) Noting that the only offense defined in section 11—501 is driving under the influence, the *Murphy* court concluded that the only criminal prosecution which can arise out of an arrest for an offense as defined in section 11—501 is driving under the influence. Specifically, the *Murphy* court held that a reckless homicide prosecution, as is involved here, does not arise out of an arrest for driving under the influence. Therefore, even though defendant was arrested for DUI prior to the request for a blood sample by the law enforcement officer, defendant was not ultimately prosecuted for DUI, and thus the Standards referenced in section 11—501.2 were inapplicable to defendant's prosecution for reckless homicide. *People v. Murphy* (1985), 108 Ill. 2d 228.

■ Having found that the Standards are inapplicable to the reckless homicide prosecution here, we nonetheless are urged by defendant to find the samples and test results inadmissible based upon ordinary standards of admissibility. (See *People v. Murphy* (1985), 108 Ill. 2d 228, 234.) In arguing that his blood samples were not handled in accordance with the Standards, defendant at trial and in this court at-

tacked the reliability of the blood test evidence on the basis that the samples were left unrefrigerated and untested for nearly two months. Both defendant and the State offered expert testimony concerning the effect of the delay and lack of refrigeration prior to testing on the accuracy of the test results. Michael Schaffer, chief toxicologist for the office of the medical examiner of Cook County, testified based upon a hypothetical question that the test results from a blood sample left unrefrigerated for approximately 50 days prior to testing would be invalid. The reason is that during that period, microorganisms add yeast to sugar, thereby increasing the alcohol content of the sample. Schaffer read from an article by Kurt M. Dubowski, Ph.D, which concluded that a preservative including sodium fluoride was appropriate for short-term storage of a blood sample at five degrees centigrade or cooler. Likewise, defendant's sister, Sue Hewlett, who is a registered nurse employed by Sherman Hospital in Elgin, read from the reference book used in the emergency room at Sherman Hospital that a sample of five millileters of blood with 50 milligrams of sodium fluoride would remain stable for seven days at room temperature. As correctly noted by the State, however, Schaffer did not give his opinion on the effect of nonrefrigeration on a blood sample containing a preservative, and Hewlett offered no testimony on whether a blood sample containing sodium fluoride should be refrigerated, stating her responsibility as a nurse was to take the blood and give it to the police officer.

The failure of the defense witnesses to testify directly on the reliability of a blood sample containing sodium fluoride and handled as were defendant's samples here is significant because Heppler and Oberg testified defendant's blood samples were withdrawn into tubes containing sodium fluoride. In contrast to defense witness Schaffer, Dr. Jeorg Pirl, assistant chief toxicologist for the State of Illinois, directly stated unrefrigerated blood with a preservative could be tested accurately for blood alcohol content even if such testing did not occur for many days. In fact, Pirl found in studying from 1967 through 1969 the effect of nonrefrigeration on blood alcohol that blood samples which were unrefrigerated for three months but which contained sodium fluoride showed a slight decrease in alcohol levels. Pirl did not publish the results of his tests, which involved an examination of 15 blood samples over a 90-day period, because similar results were already published by other researchers.

While not directly contradictory because Schaffer did not give his opinion as to the effect on blood alcohol levels of an unrefrigerated sample containing a preservative, the testimony of Pirl and Schaffer

presented the jury with differing opinions on the issue of whether defendant's blood samples could have accurately registered his blood alcohol level on the day of the accident.

The conflicting testimony of expert witnesses normally raises an issue uniquely determinable by the trier of fact who is better able to assess the credibility of the witnesses. (*Falkenbury v. Elder Cadillac, Inc.* (1982), 109 Ill. App. 3d 11, 18, 440 N.E.2d 180, 186.) The trier of fact has the discretion to accept the opinion of one expert over that of another. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 421, 429 N.E.2d 1255, 1260.) The responsibility of the trier of fact is to evaluate the factual basis for the experts' opinions and to determine the credibility and weight to be accorded each expert's testimony. (See *People v. Bilyew* (1978), 73 Ill. 2d 294, 302.) To the extent that Schaffer's testimony conflicted with Pirl's testimony, the jury could have properly accepted the testimony of Pirl and rejected that of Schaffer concerning the reliability of the test results.

■ Defendant also argues that his test results were unreliable because of the disparity between his blood alcohol level and that of his brother. Defendant emphasizes the testimony of witnesses that on the day of the accident, both defendant and his brother drank approximately the same amount of alcohol; two or three beers each. Despite this evidence, defendant's blood alcohol level was 0.282 while his brother's level was 0.018. Because defendant asserts his blood sample was not handled in accordance with the standards while his brother's sample was handled according to the Standards, defendant contends his test results are unreliable. In response, the State argues that inconsistent test results simply demonstrate that defendant drank more alcohol than his brother that day and also that the testimony of the witnesses who observed their drinking was not credible. Because either inference is capable of being drawn from the facts, it was within the province of the jury to assess the credibility of the witnesses and the weight to be accorded their testimony. Therefore, the trial court did not err in allowing into evidence the results of the blood alcohol tests performed on the sample of defendant's blood.

■ Defendant's second argument on appeal is that the trial court erred in concluding that he consented to his blood test and therefore erroneously allowed into evidence his test results. As its initial argument in opposition to defendant's position, the State contends that by deleting certain language from the 1981 version of section 11—501 (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501(c)(3)), the legislature intended to remove the requirement of consent from the statute. The State's argument is foreclosed by the decision in *People v. Frazier*

(1984), 123 Ill. App. 3d 563, 463 N.E.2d 165, where the court interpreted section 11—501.1(c), relied upon by defendant here to require the consent of the individual before blood tests could be taken.

> "The adjuration, 'none shall be given,' expressed the legislature's decision to prohibit involuntary blood and breath tests, though they would be constitutionally permissible under *Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826. (See *People v. Todd* (1975), 59 Ill. 2d 534, 322 N.E.2d 447 (discussing earlier versions of the implied consent statute (Ill. Rev. Stat. 1971, ch. 95½, par. 11—501; Ill. Rev. Stat. 1969, ch. 95½, par. 144)).) The legislature has found involuntary tests distasteful and has chosen instead to permit drivers to refuse to take tests, to withdraw their implied consent, but bear the consequences that may flow from that decision." (123 Ill. App. 3d 563, 566, 463 N.E.2d 165, 168.)

As is true here, the defendant in *Frazier* was first arrested for DUI and then a blood sample was requested by the law enforcement officer. On the authority of *Frazier*, we reject the State's construction and instead conclude the statute does require a person's consent prior to a blood test following an arrest for DUI.

■ The decision in *People v. Frazier* (1984), 123 Ill. App. 3d 563, 463 N.E.2d 165, also is germane to the issue of whether defendant revoked his refusal to consent. As is true here, the defendant in *Frazier* initially refused to consent to a blood test, but later agreed to have his blood withdrawn. On appeal, the defendant in *Frazier* argued that once he had refused his consent, the statute required that no test be given and that any reconsideration by the defendant was ineffective to revoke his initial refusal. In rejecting this argument, the *Frazier* court stated:

> "We see no reason to prohibit the police from allowing a driver to take a test if he has reconsidered his refusal. What is finally done is all that counts of course: just as a driver who fails to complete a test will be deemed to have refused to take it (*People v. Schuberth* (1983), 115 Ill. App. 3d 302, 450 N.E.2d 459), the initial refusal of the defendant here could have been given no effect once he completed the test." (123 Ill. App. 3d 563, 567-68, 463 N.E.2d 165, 169.)

His initial refusal to consent, testified to both by Oberg and defendant, therefore, did not preclude defendant from later consenting to the blood test.

The remaining question is whether defendant here consented to the blood test following his initial refusal. Neither party has cited to

any specific factual finding of the trial court; instead, the record indicates only that after hearing all the evidence, the trial judge denied defendant's motion to suppress the blood test results. The involuntariness of defendant's consent is a question of fact to be determined from all the circumstances, and the subject's knowledge of his right to refuse is only one factor to be considered in establishing whether the consent was voluntary. (See *People v. Kenning* (1982), 110 Ill. App. 3d 679, 684, 442 N.E.2d 1337, 1340.) A trial court's finding on the issue of whether consent was voluntary involves credibility determinations, and thus, a reviewing court will not overturn the trial court's findings unless they are contrary to the manifest weight of the evidence. *People v. Kenning* (1982), 110 Ill. App. 3d 679, 442 N.E.2d 1337.

In the case at bar, the only relevant testimony on defendant's consent came from three witnesses: defendant, Heppler, and Oberg. In his direct examination, defendant testified he never gave his consent for a blood test. On cross-examination, however, defendant admitted his signature was on the hospital consent form. Moreover, defendant on cross-examination also testified he told Oberg that "I will let you have my blood." By this admission, defendant's testimony supports the trial court's implicit finding that defendant did later consent to the blood test.

The testimony of both Heppler and Oberg confirm that defendant consented to the test. Heppler testified that after he had issued defendant a ticket for DUI, he informed defendant that he was requesting defendant to submit to a blood test in conjunction with the DUI ticket. From a card, Heppler then read to defendant the admonition that his refusal to submit to the test would result in a suspension of his driver's license for six months. In response to Heppler's request for blood, defendant, according to Heppler, stated that he understood the consequences of his refusal and then consented verbally to the test. Heppler testified that defendant signed the hospital consent form in his presence and denied that defendant ever expressed his refusal to take the test. Although the release does not specifically state that the signator consents to the release of blood test results, Heppler stated that defendant was told the form authorized the hospital to release information including his blood test results to law enforcement personnel.

Oberg confirmed the officer's testimony in almost all respects on the issue of defendant's consent. While acknowledging that defendant initially refused to sign the consent form, she stated he later consented after Heppler informed him that his refusal would result in an automatic six-month suspension of his driver's license. In acknowledg-

ing that defendant did sign the hospital release form, Oberg stated she explained to defendant that the form constituted his assent to blood withdrawal for alcohol testing. On cross-examination, Oberg admitted the release form did not specifically mention blood, but stated she explained to defendant that the form authorized her to take blood samples both for the hospital and for analysis of alcohol content. Oberg specifically recalled that defendant verbally agreed to sign the hospital release form. After reviewing the testimony of these three witnesses, we conclude the trial court's ruling is not against the manifest weight of the evidence.

■■ ■ Defendant's third argument on appeal is that the trial court erred in allowing into evidence statements made by him without benefit of *Miranda* warnings. Following evidence at a pretrial hearing held on November 4 and 10, 1982, the trial court denied defendant's motion to suppress defendant's statements made to Heppler at St. Joseph's Hospital in Elgin. The trial court's ruling on a motion to suppress should not be reversed unless manifestly erroneous. (*People v. Newsome* (1983), 117 Ill. App. 3d 1005, 1010, 454 N.E.2d 353, 357.) Only statements made as a result of custodial interrogation must be preceded by *Miranda* warnings. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.

The essential determination, therefore, is whether defendant was in custody or was otherwise deprived of his freedom in any significant way prior to the questioning. In considering whether a suspect is in custody, several factors are relevant including: (1) the place of the interrogation; (2) any statement or nonverbal conduct indicating an accused is not free to leave; (3) the extent of the knowledge of the police officers and the focus of their investigation; (4) the intentions of the police officers; and (5) the objective circumstances surrounding the investigation to determine what a reasonable man innocent of any crime would perceive. (*People v. Newsome* (1983), 117 Ill. App. 3d 1005, 1007-08, 454 N.E.2d 353, 355.) Application of these factors to the evidence introduced at the suppression hearing establishes that the trial court's decision was not manifestly erroneous.

The questioning which defendant asserts was conducted in violation of *Miranda* occurred in an emergency room cubicle at the hospital where defendant had been taken for treatment. Two Illinois decisions, after examining whether questioning in a hospital following a traffic accident amounted to custodial interrogation, concluded that *Miranda* warnings were not required. (*People v. Kenning* (1982), 110 Ill. App. 3d 679, 442 N.E.2d 1337; *People v. Clark* (1977), 55 Ill. App.

3d 496, 371 N.E.2d 33; see generally Annot., 31 A.L.R.3d 565, 620-25 (1970).) In *Kenning*, the court ruled that the defendant was not in custody when questioned in the emergency room at the hospital. As is true in the case at bar, the officers in *Kenning* apparently from their on-scene contact with the defendant had already observed the odor of alcohol on the defendant's breath prior to the questioning at the hospital. Relying on this fact, the trial court in *Kenning* concluded the defendant was a suspect and therefore, that *Miranda* warnings were required. In reversing the suppression order, the reviewing court observed that the status of "suspect" does not necessarily warrant *Miranda* warnings (see *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711), and that the record established that neither the defendant nor the officer believed that defendant was in custody. In *Clark*, the facts suggest that the officer's first contact with the defendant was in the intensive care unit of the hospital approximately 4½ hours after the accident. During the questioning, the defendant admitted he had been driving the car involved in the accident and that prior to the accident he had consumed several beers. Immediately following the questioning, just as was true here, the officer placed the defendant under arrest and read him his *Miranda* rights. Based upon *Kenning* and *Clark*, we conclude the fact that the questioning occurred in the hospital does not suggest that the trial court's ruling is manifestly erroneous.

The second relevant factor in determining the custody issue is whether statements or nonverbal conduct suggested to the defendant that he was not free to leave. Defendant emphasizes that he and Heppler arrived at the hospital at almost the same time, thereby allowing defendant no time to leave the hospital on his own. As argued by the State, however, defendant's emphasis on whether he had time to leave the hospital seems misplaced. Defendant's argument presumes that defendant could only have been free to leave prior to Heppler's arrival, but most custody questions including those where custody is found not to exist involve the presence of a police officer.

Defendant has not cited any testimony introduced at the suppression hearing which suggests that Heppler or anyone else made statements indicating defendant was not free to leave. Defendant does cite to his testimony not at the suppression hearing, but at *trial* that he could not make a phone call because "they" did not want him to leave. In fact, however, defendant testified that he guessed he could have called his parents, but that "they" didn't want him to leave the emergency room. A reasonable inference from this testimony is that defendant was free to make a phone call, but after he was first

treated in the emergency room.

Defendant also references certain nonverbal conduct which he asserts implies custody. According to Heppler, the hospital security guard was present with defendant at all times during his stay in the emergency room cubicle. Defendant does not argue that the guard was an agent of Heppler; just that the guard's presence constituted nonverbal conduct suggesting a restriction of his freedom. The State objects to the suggested parallel between the hospital emergency room with guard and a stationhouse. As explained by the State, Oberg, the registered nurse who worked in the emergency room on the evening defendant was admitted, testified she requested the presence of the security officer because defendant was disoriented, was using abusive language, and would not remain on the cart where she had directed him to sit. She stated she called for the security guard because "I felt I could not handle him myself at that time." Oberg's testimony established that the guard's presence was requested by an agent of the hospital and not by the police. Moreover, the guard was not there to restrict defendant from ultimately leaving the hospital, but rather to insure the nurse could treat defendant properly. Although the police did not tell defendant he was free to leave, neither did they prohibit him from leaving. In fact, the record reflects that defendant never asked to leave. On these facts, defendant's freedom to leave was not restricted by the police to an extent implicating a custodial interrogation.

The next factor enumerated in *Newsome* is the extent of the knowledge of the officers and the focus of their investigation. The State concedes in its appellate brief that defendant was the focus of its investigation when Heppler questioned defendant at the hospital, but emphasizes that *Miranda* warnings are not required merely because a defendant is a police suspect. (See *People v. Kenning* (1982), 110 Ill. App. 3d 679, 684, 442 N.E.2d 1337, 1340.) Distinguishing the instant type of investigation from those where the police are certain that a crime has been committed, the State contends that Heppler was not even able to determine if a crime had been committed until he had concluded that defendant appeared to be intoxicated. The State points to Heppler's testimony that he did not question defendant at the scene of the accident, because his contact with defendant there was minimal. Also, the State cites to Heppler's testimony that he had not decided conclusively to arrest defendant prior to questioning him at the hospital although Heppler did testify that defendant admitted to him at the scene that "I hit the guy. I know I killed the guy. I hit him." According to Heppler, defendant at the scene

"smelled strongly of alcoholic liquor." These two facts suggest Heppler knew that defendant was involved in the collision and had been drinking prior to the accident. However, while evidence of intoxication is probative of the issue of recklessness in a reckless homicide prosecution (see *People v. Grover* (1981), 93 Ill. App. 3d 877, 417 N.E.2d 1093), evidence of intoxication does not in and of itself establish recklessness. (See *People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251; see also *People v. Kenning* (1982), 110 Ill. App. 3d 679, 442 N.E.2d 1337 (officer's observation of alcohol on defendant's breath at the time of accident did not preclude use of statements at hospital without *Miranda* warnings).) Defendant's admission that he had struck the child and Heppler's brief observation at the scene alone would not necessarily require an arrest. For example, the possibility remained that the child was riding in the wrong lane when the collision occurred or as defendant initially maintained at the hospital, that the child was riding his bicycle in the middle of the road. Also not refuted by Heppler's brief observation of defendant at the scene was the possibility that defendant had consumed only a very small amount of alcohol and that his dazed condition was a result of the accident. Heppler's testimony that he had not decided to arrest defendant prior to questioning him at the hospital suggests his observation of alcohol on defendant's breath was insufficient to arrest him for driving under the influence.

As additional evidence of Heppler's knowledge of the offense, defendant cites Heppler's investigation at the scene of the accident which resulted in six witness statements. Heppler stated he did not complete the narrative portion of each witness' statement until after defendant was arrested. Also, although the witness statements were incorporated into Heppler's 17-page accident report, this exhibit is not included in the record on appeal, so we are unable to determine precisely what information Heppler had gathered prior to taking defendant's statement at the hospital. Moreover, defendant's counsel never questioned defendant at the hearing regarding the content of those statements in the accident report.

The relevant inquiry concerning the fourth *Newsome* factor—the intention of the officers—is whether the officer believed defendant was free to leave at the time of the initial questioning. (*People v. Newsome* (1983), 117 Ill. App. 3d 1005, 1008, 454 N.E.2d 353, 355.) Heppler did testify he had not decided to arrest defendant prior to the questioning. Moreover, Heppler suggested the ambulance personnel requested that a security officer be present when the ambulance arrived at the hospital because "of his condition or the way he was

acting." Heppler denied requesting the security guard's presence and doubted any other officer did because he was the officer in charge of the investigation. From this testimony, the fact is clear that Heppler did not assign the security person to guard defendant. In fact, Heppler's testimony suggests that the medical personnel at the hospital imposed the restriction on defendant's freedom by requesting a security officer. Heppler's testimony, therefore, does not support a conclusion that the trial court's ruling is manifestly erroneous.

The final factor enunciated in *Newsome* states an objective test; whether a reasonable man innocent of any crime would perceive he was in custody. The security guard was requested by medical personnel and not the police. Defendant was not treated in a separate section of the hospital, but was treated in a room normally used for injured patients. Moreover, the record contains no evidence that defendant was unreasonably detained at the hospital. In fact, he had only been receiving treatment for at most two hours when Heppler arrived to question him. Considering defendant's injuries and the testimony that the emergency room that evening was very busy, we conclude a reasonable person would not perceive a two-hour stay as excessive and thus, would not perceive he was in "custody."

■ The fourth issue raised by defendant is that the trial court erred in allowing the jury to hear the testimony of the State's accident reconstruction expert even though the trial court subsequently struck the testimony and admonished the jury not to consider the expert's testimony. On December 28, 1982, defendant filed a motion *in limine*, which the court denied, requesting the court to direct the prosecuting attorney "to refrain from attempting to admit or refer to any reconstruction expert's testimony during the trial of this cause." When the State called Aycock, the accident reconstruction witness, defendant renewed his objection, the trial court noted the objection was continuing, but overruled defendant's objection. After the State rested its case, defendant made a motion to strike Aycock's testimony on which the court reserved ruling. Prior to the testimony of defendant's last witness, the court granted defendant's motion to strike Aycock's testimony and instructed the jury that Aycock's testimony had been stricken and that they were to disregard his testimony.

Notably absent from defendant's written motion to strike filed on January 7, 1983, was any request for a new trial based upon the jury's exposure to Aycock's testimony. Instead, defendant requested "that all testimony of Thad Aycock be stricken and the jury told to disregard same." In effect, then, the trial judge by striking Aycock's testimony granted defendant all the relief that he had requested.

Defendant then proceeded to argue additional motions and even made a motion for a directed verdict, but never sought a mistrial on the grounds that the court's admonishment was insufficient to cure the prejudice caused by Aycock's testimony. Defendant then presented the testimony of his last witness and made closing arguments also without requesting a mistrial. In fact, the only place in the record cited by either party where defendant's prejudice argument was raised at the trial court was in paragraph 8 of defendant's post-trial motion. In a somewhat analogous situation, an error in the admission of testimony which is not immediately objected to by a party but is raised subsequently is nevertheless waived. (See *People v. Carraro* (1979), 77 Ill. 2d 75, 81, *cert. denied sub nom. Gray v. Illinois* (1980), 445 U.S. 944, 63 L. Ed. 2d 777, 100 S. Ct. 1340.) Because defendant here never requested a mistrial until after the jury verdict, he has waived this argument of jury prejudice.

Even if defendant has not waived this contention, he has cited no case where accident reconstruction testimony, initially allowed but later stricken, nonetheless required reversal despite the trial court's direction that the jury not consider the expert's stricken testimony. An instruction to disregard evidence ordinarily cures error in its admission. (*People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683.) Defendant relies upon several cases as support for his general contention that prejudicial testimony heard by a jury cannot always be cured by sustaining defense objections and striking the testimony. (*People v. Smith* (1973), 12 Ill. App. 3d 1037, 1041, 299 N.E.2d 489, citing *People v. Gregory* (1961), 22 Ill. 2d 601, 177 N.E.2d 120, and *People v. Buckminster* (1916), 274 Ill. 435, 113 N.E. 713; see also *People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251.) *Smith* involved a prosecutor who questioned the arresting officers at trial concerning what the defendant had told them on the evening of his arrest. Throughout the testimony of the two officers, the prosecutor elicited their statements that defendant had told them he had pulled previous jobs and was in the neighborhood that evening because he had just gotten out of jail. The *Smith* court devoted much attention to its conclusion that the prosecutor purposely elicited this testimony despite knowing that the statements were inadmissible.

No such allegation is suggested by defendant here. The record demonstrates the State's Attorney in good faith offered the expert testimony of Aycock. Moreover, the prejudicial impact of prior crimes and of previous incarceration was greater than Aycock's opinion that defendant was speeding. Defense's counsel conducted an effective cross-examination of Aycock in the jury's presence which established

among other things that Aycock had not visited the scene of the accident and had relied upon facts not introduced into evidence. Aycock also admitted that his opinion on speed was predicated on his conclusion that the brakes on defendant's car were locked for the entire distance including the distance in the cornfield; Aycock conceded his opinion on speed would change if his assumption were incorrect. As Aycock's testimony was subject to vigorous cross-examination, its prejudicial impact, if any, was lessened substantially, and the court's order that it be stricken and disregarded necessarily cured any prejudice. Compare *People v. Gregory* (1961), 22 Ill. 2d 601 (where trial court erred by *admitting* evidence of prior "jobs" with only a cautionary instruction); *People v. Buckminster* (1916), 274 Ill. 435, 113 N.E. 713 (codefendant's confession implicating the defendant which was *admitted* with only cautionary instruction was reversible error); *People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251 (instruction limiting jury's consideration of treating doctor's testimony in reckless homicide charge was insufficient where doctor's conclusion that the defendant was intoxicated was highly prejudicial to the defendant's DUI defense).

The conclusion that the prejudicial impact, if any, of Aycock's testimony was minimal is supported by the State's argument that nearly all of the witnesses who estimated defendant's speed testified that he was traveling faster than the 55 miles per hour claimed by defendant. Kimberlee Motisi, the sister of the decedent, testified that defendant appeared to be traveling 70 to 75 miles per hour. Mrs. Motisi, mother of the victim, stated that defendant was traveling approximately 75 to 80 miles per hour. Two eyewitnesses who were unrelated to any of the parties involved testified defendant was exceeding the speed limit, with one estimating that defendant was traveling 65 to 70 miles per hour. Even defendant's own brother testified that he was driving at a speed of 50 to 55 miles per hour and that defendant therefore must have been going faster since defendant was attempting to pass him at the time of the collision. The trial court's conclusion that Aycock's testimony did not irreversibly prejudice the jury cannot be considered error.

While defendant argues that the trial court compounded the error by not again instructing the jury to ignore Aycock's testimony after the close of all the evidence, the State argues and we agree that defendant has waived this contention both by never requesting the court to make the additional instruction and by failing to tender such an instruction. Also, we note that the trial court did tender Illinois Pattern Jury Instruction, Criminal, No. 1.01 (2d ed. 1981) which in-

structed the jury to consider only the testimony of witnesses which the court had received into evidence.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

HOPF, J., concurs.

JUSTICE REINHARD, dissenting:

For the reasons that follow, I respectfully dissent from the majority's conclusion that the Department of Public Health Standards referenced in section 11—501.2(a)(1) of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2(a)(1)) were inapplicable to the prosecution of defendant for the offense of reckless homicide. The factual background of defendant's initial arrest for DUI and the law enforcement officer's request for an defendant's submission to a blood test pursuant to the provisions of the implied-consent statute (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.1) make this case distinct from the situation before the supreme court in *People v. Murphy* (1985), 108 Ill. 2d 228, 483 N.E.2d 1288, relied on by the majority, where the defendant was neither initially arrested for DUI nor was the blood test taken pursuant to the implied-consent provision.

I must acknowledge that in *Murphy* there is language which is susceptible to the broad construction that section 11—501.2 was applicable only to circumstances where the ultimate prosecution was for DUI as defined in section 11—501. However, upon closer analysis, it is apparent that the court in *Murphy* was not specifically faced with ascertaining whether section 11—501.2 is applicable where the blood test arises out of defendant's initial arrest for DUI and his submission to the test follows a request by a law enforcement officer who advised him from a card of the provisions of the implied-consent statute.

Section 11—501.2, in pertinent part, states:

> "(a) Upon the trial of any civil or criminal action or proceeding arising out of an arrest for an offense as defined in Section 11—501 or a similar local ordinance, evidence of the concentration of alcohol, other drug or combination thereof in a person's blood or breath at the time alleged, as determined by analysis of the person's blood, urine, breath or other bodily substance, shall be admissible. Where such test is made the following provisions shall apply: ***."

In *Murphy*, the defendant was not arrested for DUI. Thus, section 11—501.2 makes it clear that in that case the provisions in section

11—501.2(a)(1) do not apply because the reckless homicide proceeding did not arise out of an arrest for an offense defined in section 11—501. However, in the case at bar, the reckless homicide proceeding clearly did arise out of defendant's initial arrest for DUI, an offense defined in section 11—501, and the blood test results were obtained as a direct result of the law enforcement officer's request under the implied-consent statute.

The plain language of section 11—501.2 reads that "[u]pon the trial of *any* civil or *criminal action* or *proceeding arising out of an arrest for an offense* as defined in Section 11—501 [DUI] \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2(a).) It is the practice to give statutory language its customary meaning, unless doing so would be inconsistent with the purpose of the statute. (*People v. Christensen* (1984), 102 Ill. 2d 321, 328, 465 N.E.2d 93.) The implied-consent statutory scheme indicates a purpose to provide restrictions on chemical testing and analysis of a person's blood, urine, or breath as a safeguard to one who by driving on the Illinois highways implicitly consents to being chemically tested when he is charged with DUI. (See *People v. Hartwick* (1984), 128 Ill. App. 3d 272, 275, 470 N.E.2d 606.) It is logical and reasonable that the legislature intended the requirements of section 11—501.2 to apply whenever a law enforcement officer places a person under arrest for DUI and obtains a test pursuant to his request under the implied-consent statute. Whether a defendant is ultimately tried for DUI or for the more serious offense of reckless homicide, the same facts remain that the test was obtained by a law enforcement officer through the application of the implied-consent statute. The reckless homicide prosecution here falls squarely within the statute's definition of a "proceeding arising out of an arrest [for DUI]," and the further requirements of section 11—501.2(a)(1) are applicable.

As the State has not contested on appeal the defendant's contention that Rule 11.01(5) of the Department of Public Health was not complied with concerning the delivery of the blood sample taken from defendant, the trial court erred in admitting the test results into evidence and the defendant must be given a new trial.