The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Anthony Francis MILHOLLIN,
Defendant–Appellee.

No. 87SA353.

Supreme Court of Colorado,
En Banc.

Feb. 8, 1988.

James F. Smith, Dist. Atty., Michael J. Milne, Deputy Dist. Atty., Brighton, for plaintiff-appellant.

David F. Vela, Public Defender, Robert W. Pepin, Deputy Public Defender, Brighton, for defendant-appellee.

VOLLACK, Justice.

The People bring this interlocutory appeal from a suppression order entered by the Adams County District Court. This order suppressed (1) the results of a blood alcohol test performed on Milhollin after he was involved in a traffic accident, and (2) a statement made by Milhollin to the investigating trooper at the hospital. Because the trial court applied the wrong standard in suppressing the test results, we reverse that portion of the order suppressing the blood test. Because the defendant's statement to the investigating trooper was erroneously suppressed, we reverse that portion of the order and remand with instructions to admit the statement into evidence.

### I.

On October 25, 1986, the defendant-appellee, Anthony Milhollin (hereinafter Milhollin or the defendant), was operating a motorcycle which collided with a car. The defendant and his passenger suffered injuries, and they were both transported by ambulance to Saint Anthony's Central Hospital. There were witnesses to the defendant's driving before the accident, as well as to the accident itself.

Colorado State Patrol Trooper Conrad Sandoval was working in Adams County when he was dispatched to the scene of the accident. He arrived to find fire and ambulance personnel, a damaged car, and a damaged motorcycle. The parties who had been riding the motorcycle both sustained injuries and were already being treated by fire department personnel when Sandoval arrived. Sandoval helped transport the defendant to the ambulance, but he and the defendant did not make any statements to each other at the time. Sandoval testified that he did not learn the identity of the two injured parties until later.

Trooper Sandoval took statements from three witnesses who had seen the driving and the events leading to the accident. Witness Leigh told the officer that the motorcycle had passed him on I–25 at a speed of ninety to 100 mph, followed closely by a Datsun 280Z. The motorcycle and Datsun exited I–25 at 58th Avenue, and Leigh followed them. When Leigh reached the intersection at 58th Avenue, the motorcycle had already collided with a Pontiac and the Datsun had left the scene. Witness Raymond told Sandoval that when he was passed by the motorcycle and Datsun on I–25, they were traveling at ninety to 100 mph, driving about twenty-five feet apart. He saw them exit at 58th Avenue, but did not say whether he had witnessed the accident. Witness Lee had been stopped at the red light in the right lane on 58th Avenue when he saw the motorcycle make a left turn through the intersection against the red light, at a speed of about forty-five mph. Lee saw the motorcycle collide with a Pontiac which was traveling through the intersection on a green light. The driver of the Pontiac, Dan Trujillo, told Sandoval that he was traveling westbound on 58th Avenue and did not see the motorcycle turn in front of him; he just "felt a bang against his car."

The witnesses were in agreement that the Datsun never made physical contact with either the Pontiac or the motorcycle. Witnesses Lee and Raymond attempted to stop the driver of the Datsun, but were unable to detain him until law enforcement personnel arrived.

After the defendant and his passenger were transported from the scene by ambulance, Sandoval investigated the damage to the vehicles and the location and length of the skid marks. Based on his investigation, he determined that the physical evidence was consistent with the statements given to him by the three witnesses and the driver of the Pontiac.

After completing his on-the-scene investigation Sandoval drove to St. Anthony's Hospital, where the staff directed him to the emergency room where the defendant was waiting for surgery. When he found the ward, Sandoval identified himself to Milhollin as the trooper investigating the accident at I–25 and 58th Avenue. Sandoval asked the defendant if he was the driver of the motorcycle; the defendant stated that he was. Sandoval was in uniform and wearing a gun, but he testified that he never took out his gun or made any threats or promises. He also testified that that at no time did he place Milhollin under arrest.

At this point, Sandoval noted that Milhollin was conscious and had bloodshot eyes and the odor of an alcoholic beverage on his breath. Sandoval advised him of the charges against him, and his *Miranda* rights. Sandoval read each right to him from an advisement of rights form, completing the form as he spoke. This form was admitted into evidence at the motions hearing and confirmed that Sandoval advised the defendant that he was under in-vestigation for the traffic offenses of speed contest, reckless driving, and violation of a red signal light. The defendant indicated to Sandoval that he understood and waived his *Miranda* rights, and did not want an attorney. However, when Sandoval asked him to sign the advisement of rights form, Sandoval testified that the defendant "said a partial sentence: 'Why don't you wait until I'm halfway ...' and that was all he said." In response to this statement by Milhollin, Sandoval terminated his questioning.

Based on his observation of the defendant at the hospital, Sandoval determined that Milhollin should also be investigated for driving under the influence of alcohol. Because he suspected that an alcohol-related offense may have occurred, Sandoval testified that he orally advised Milhollin that he was under investigation for driving under the influence pursuant to Colorado's "express consent" law.[1] This charge was not written on the advisement form. He offered Milhollin the choice between a blood or breath test. Sandoval did not complete or use a standard "Express Consent" revocation notice form. Sandoval testified: "I advised him of the investigation, that he had an odor of an alcoholic beverage on his breath, in my reasoning; and I offered both tests to him." The defendant selected a blood test, and stated to Sandoval: "I have had three beers since 7:00 p.m." A blood sample was drawn by a phlebotomist a short time later; it had been two to two and one-half hours since the accident.

These events occurred on October 25, 1986. On December 12, 1986, the defendant was charged with one count of vehicular assault, section 18–3–205,[2] 8B C.R.S.

---

1. On cross-examination, Sandoval testified: "I advised him of his Express Consent Law that he was required to take a test, yes."

2. **18–3–205. Vehicular assault.**
   .   .   .   .   .
   (1)(b)(I) If a person operates or drives a motor vehicle while under the influence of any drug or intoxicant and this conduct is the proximate cause of a serious bodily injury to another, he commits vehicular assault....
   .   .   .   .   .

(c) Vehicular assault is a class 5 felony.
(2) In any prosecution for a violation of subsection (1) of this section, the amount of alcohol in the defendant's blood at the time of the commission of the alleged offense, or within a reasonable time thereafter, as shown by chemical analysis of the defendant's blood, urine, or breath, shall give rise to the following presumptions:
(a) If there was at such time 0.05 percent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant

(1986), a class 5 felony. The defendant filed a motion to suppress the results of the blood test, and a motion to suppress his statements to Sandoval at the hospital. The trial court held a hearing on the motions. After hearing testimony, the trial court issued a written order suppressing the blood test results and suppressing the defendant's pre-*Miranda* affirmative response to Sandoval's query whether he was the driver of the motorcycle. Sandoval's post-*Miranda* statement regarding his consumption of the three beers was not suppressed. The prosecution filed this interlocutory appeal from the suppression order.

## II.

The trial court suppressed the blood test results under two theories. First, the court held that the extraction of blood was unlawful because the defendant was not under arrest at the time. Second, the court held that there was not a "clear indication" of intoxication justifying the extraction of blood.

## A.

■ In holding that blood cannot legally be drawn from a person who is not under arrest, the trial court relied on *People v. Williams,* 192 Colo. 249, 557 P.2d 399 (1976). The trial court characterized Milhollin's blood test as "a warrantless nonconsensual extraction of blood from a Defendant."[3] We resolved this issue in *People v. Sutherland,* 683 · P.2d 1192 (Colo. 1984), where "the defendant's principal contention center[ed] around his claim that a defendant must be formally arrested before a blood sample may be taken." *Id.* at 1195. While acknowledging that this is the rule in a number of jurisdictions, we rejected the majority view. Instead, we held

was not under the influence of intoxicating liquor.

(b) If there was at such time in excess of 0.05 percent but less than 0.10 percent by weight of alcohol in the defendant's blood, such fact may be considered with other competent evidence in determining whether or not the defendant was under the influence of alcohol.

that "an *arrest is not a precondition* to obtaining a blood sample from a person suspected of committing an *alcohol-related felony offense." Sutherland,* 683 P.2d at 1196 (emphasis added). Accordingly, the court's first basis for suppressing the blood test results is erroneous and requires reversal.

## B.

The court's second basis for the suppression order was its holding that the facts did not support a "clear indication that evidence of intoxication or drug abuse will be found." Suppression Order at 1. Specifically, the court held:

Defendant was not arrested, and the indicia of intoxication present (eyes bloodshot, odor of alcohol on breath, Defendant appeared to the officer to be coherent and rational, Defendant in substantial pain from broken leg) do not in sum appear to the Court to rise to the level of a "clear indication" of intoxication.

Suppression Order at 2. In so holding, the court again relied on *People v. Williams,* 192 Colo. 249, 557 P.2d 399 (1976).

In *People v. Williams,* we applied *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) to a manslaughter case. The four requirements of the *Schmerber* test are: (1) probable cause for arrest of the defendant for an alcohol-related driving offense, (2) a clear indication that the blood sample will provide evidence of the defendant's level of intoxication, (3) exigent circumstances which make it impractical to obtain a search warrant, and (4) that the test be reasonable, and conducted in a reasonable manner. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

(c) If there was at such time 0.10 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of alcohol.
8B C.R.S. (1986).

3. It appears from the record that the defendant did, in fact, consent to have his blood drawn. However, the parties did not raise the issue of consent on appeal.

In *Williams*,[4] the defendant was placed under arrest before extraction of blood and urine samples was ordered. *Id.* 192 Colo. at 256–57, 557 P.2d at 405. We held that there must be a showing of more than mere probable cause to justify forced production of bodily fluids. *Id.* at 256–57, 557 P.2d at 406. The "more protective standard" we adopted in *Williams* is the "clear indication" test: "such internal body searches may be made only where, *in addition to the probable cause supporting the arrest, there exists a 'clear indication' to believe that relevant evidence will be obtained.*" *Id.* at 257, 557 P.2d at 406 (emphasis added). We interpreted the "clear indication" language as follows:

> In determining whether forced production of bodily fluids is permissible, the appropriate standard is *clear indication* that evidence of intoxication or drug abuse will be found. Moreover, there must be some indication that evidence of drugs or alcohol, if found, will be relevant to a crime for which the defendant may be charged.

*Id.* at 258, 557 P.2d at 406 (emphasis in original). We further held:

> In the typical alcohol or drug case, this clear indication requirement is easily satisfied by observations of the defendant's speech, gait, breath, appearance, and conduct. Obviously, the "clear indication" test is not involved where the de-

fendant expressly consents or consent is implied under section 42–4–1202(3), C.R.S. (1973) [now the express consent statute, section 42–4–1202, 17 C.R.S. (1987 Supp.)].

*Id.* at 259 n. 13, 557 P.2d at 407 n. 13.

After *Williams*, we addressed the more specific issue of obtaining an involuntary blood sample from a putative defendant when he or she is suspected of committing an alcohol-related offense in *People v. Sutherland*, 683 P.2d 1192 (Colo.1984). In *Sutherland*, the defendant was charged with several counts of vehicular assault and vehicular homicide;[5] both are alcohol-related driving offenses. The defendant in *Sutherland* was in the hospital being treated for injuries, but was not under arrest, when his blood sample was obtained. Testimony at Sutherland's trial established that two individuals from the car involved in the collision each told the trooper that the other was driving. *Id.* at 1194. The trooper had assisted at the scene of the accident, and when he arrived at the hospital he "smelled the odor of alcohol on the breath of both the defendant and Miller." *Id.* "Given these circumstances, the officer directed that blood specimens be drawn from both men, even though he had not arrested either person." *Id.* After several days of further investigation, the defendant was arrested and charged.

---

4. In *Williams*, this court addressed the question of probable cause, 192 Colo. at 256–57, 557 P.2d at 405–06, but then held that the facts relating to the blood alcohol test did not meet the "clear indication" requirement of *Schmerber* and affirmed the trial court's suppression of the blood and urine tests on that basis. As a result, the court did not address the third and fourth requirements of the *Schmerber* test.

5. **18–3–106. Vehicular homicide.**

(1)(b)(I) If a person operates or drives a motor vehicle while under the influence of any drug or intoxicant and such conduct is the proximate cause of the death of another, he commits vehicular homicide....

(c) Vehicular homicide is a class 4 felony.
(2) In any prosecution for a violation of subsection (1) of this section, the amount of alcohol in the defendant's blood at the time of the commission of the alleged offense, or within a reasonable time thereafter, as shown by chemical analysis of the defendant's blood, urine, or breath, shall give rise to the following presumptions:

(a) If there was at such time 0.05 percent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor.

(b) If there was at such time in excess of 0.05 percent but less than 0.10 percent by weight of alcohol in the defendant's blood, such fact may be considered with other competent evidence in determining whether or not the defendant was under the influence of alcohol.

(c) If there was at such time 0.10 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of alcohol.

8B C.R.S. (1986).

In *Sutherland,* we expressly adopted the four-part test set forth in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), as to the test governing extraction of an involuntary blood sample from a putative defendant who is suspected of an alcohol-related driving offense. The trial court should have applied the four-part test adopted in *Sutherland* because Milhollin was suspected of an alcohol-related driving offense.

## C.

### 1.

As to the first *Sutherland* requirement of "probable cause," the facts set forth in the record establish that the trooper had probable cause for arrest of the defendant on an alcohol-related offense, even though Milhollin was not actually arrested. There were consistent statements from witnesses who saw the defendant was operating a motorcycle at an excessive speed and in a dangerous manner, resulting in an accident which caused injury to the defendant and his passenger. When the trooper arrived at the hospital about two hours after the accident, he found that the defendant had the odor of an alcoholic beverage on his breath and bloodshot eyes. This uncontroverted evidence at the hearing establishes that the trooper had probable cause to arrest the defendant for an alcohol-related driving offense.

### 2.

The second part of the *Sutherland* test is whether there is "a clear indication that the blood sample will provide evidence of the defendant's level of intoxication." Instead of assessing whether the facts established a clear indication that the defendant's blood sample would provide evidence of intoxication, the trial court made a ruling as to whether there was a clear indication that the defendant was intoxicated.

6. In *Williams,* we held that the "clear indication" test was not met because the only evidence that a blood sample would provide evidence of the defendant's intoxication was that the defendant had been seen drinking unidentified bever-

Testimony at the hearing established that the trooper noted the defendant's breath and bloodshot eyes after he had spoken with three witnesses who verified the defendant's driving which caused the accident. The "clear indication" requirement is "easily satisfied by observation of the defendant's speech, gait, breath, appearance, and conduct." *Williams,* 192 Colo. 249 at 258 n. 13, 557 P.2d 399 at 407 n. 13. Physical evidence at the scene corroborated the witnesses' statements. These facts meet the requirement that there be a "clear indication" that a blood sample would provide evidence of the defendant's level of intoxication.[6]

### 3.

The third part of the *Sutherland* test is whether exigent circumstances existed which made it impractical for the trooper to obtain a search warrant. In *Schmerber,* the United States Supreme Court applied the exigent circumstance requirement to similar facts and arrived at the following conclusion:

> The officer in the present case, ... might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence...." We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. *Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident,* there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36 (emphasis added) (citation omitted).

ages at a local bar earlier on the day of the shooting. Without more, this did not meet the "clear indication" test. 192 Colo. at 256, 258, 557 P.2d at 405, 407.

These considerations are dispositive of the facts before us. The inherent nature of a blood alcohol test justifies the conclusion reached by the United States Supreme Court especially when time has elapsed while the driver is transported to a hospital and the investigating officer is detained at the accident scene. Because this case involves the same facts and concerns, we conclude that exigent circumstances existed which made it impractical to obtain a search warrant, and the third part of the *Sutherland* test is met.

### 4.

The last *Sutherland* requirement is that the test be reasonable, and conducted in a reasonable manner. In *Schmerber*, the court considered the lack of risk and highly effective results of blood-alcohol testing, and the fact that blood was extracted "in a hospital environment according to accepted medical practices." 384 U.S. at 771, 86 S.Ct. at 1836. As in *Schmerber*, the extraction of blood for a blood-alcohol test here was reasonable, because it "is a highly effective means of determining the degree to which a person is under the influence of alcohol." *Id.* Milhollin's blood extraction was performed in a hospital, according to accepted medical practices. On this basis, we conclude that the fourth test is met.

We reverse the trial court's suppression order and hold that the blood test results are admissible at trial.

### III.

### A.

The trial court ruled that Milhollin's statement to the trooper that he was the driver of the motorcycle must be suppressed because the defendant was not advised of his *Miranda* rights before making the statement, and a reasonable person in the defendant's situation would feel that he had been taken into custody. We disagree.

The trial court suppressed the statement in question because "Defendant's circumstances amounted to a custodial setting." The trial judge based this conclusion on his findings that "the place was a hospital, where Defendant was in pain," that the trooper was there "to gather evidence from Defendant as a suspect, since he had with him advisment [sic] of rights forms." As for the trooper's words, the court apparently relied on statements by the defendant's mother, who testified at the motions hearings that the defendant "asked 'Is this [a blood or breath test] necessary?' and the officer responded 'It's a requirement of the state.' " Regarding the defendant's verbal or non-verbal responses, the trial court noted that testimony established that the defendant was in pain. Finally, the trial court cited the trooper's "incorrect statement to the Defendant that signing the forms was 'a requirement of the state.' " The court also found that "the officer made various demands, sometimes misleading."

In contrast, the court also found that "[n]othing in the record indicates that the officer's tone was abusive," and that "Defendant was never restrained or limited in his movement *by the officer.*" Based on these factual findings, the trial court concluded: "a reasonable person in Defendant's position would have believed that he had been deprived of his liberty in a significant way."

### B.

The *Miranda*[7] warning is required when a person is being interrogated in a custodial setting. There must be both custody and interrogation before *Miranda* warnings are required. *People v. Smith*, 173 Colo. 10, 475 P.2d 627 (1970). The test for determining if a person is in custody, or in a custodial setting, is whether a reasonable person in the suspect's position would consider himself deprived of his freedom in a significant way. *Jones v. People*, 711 P.2d 1270, 1275 (Colo.1986); *People v. Johnson*, 671 P.2d 958, *appeal after remand*, 681 P.2d 524 (Colo.1983). Relevant criteria include the time, place, and purpose of the encounter, the words and demeanor of the officer, and the person's verbal or non-verbal response to any directions given

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to him by the officer. *People v. Harper,* 726 P.2d 1129, 1131 (Colo.1986).

The location where questioning occurs is just one of a number of considerations; the place alone is not conclusive of whether questioning has occurred in a custodial setting. "Custodial interrogation for purposes of *Miranda* does not necessarily refer to police station interrogation." *Johnson,* 671 P.2d at 961. Likewise, "confinement to a hospital bed is insufficient alone to constitute custody." *People v. Rodriquez,* 645 P.2d 857, 860 (Colo.App. 1982) (citing *Cummings v. Maryland,* 27 Md.App. 361, 341 A.2d 294 (1975). *See People v. Garrison,* 176 Colo. 516, 491 P.2d 971 (1971). ("The first answer as to where the defendant was going was given during the investigatory stage of the process. When an officer arrives upon the scene of an accident, it is normal procedure to determine what has happened and which way the cars involved were headed. The fact that the defendant was asked to sit in the police car does not turn investigation into custody under these circumstances." *Id.* at 519–20, 491 P.2d at 973.)

Roadside questioning of a motorist pursuant to a routine traffic stop does not necessarily constitute custodial interrogation requiring a *Miranda* advisement. *People v. Wallace,* 724 P.2d 670 (Colo. 1986). In *Wallace,* a police officer arrived at the accident scene and asked the defendant what had happened. The defendant made a statement to the officer[8] and was subsequently arrested and advised of his *Miranda* rights. *Id.* at 672. The trial court suppressed this statement, holding that the setting was custodial in nature thus requiring a *Miranda* advisement. We reversed the suppression order because the trial court applied the incorrect test,[9] but we also cited *People v. Archuleta,* 719 P.2d 1091 (Colo.1986), for the general rule that "the roadside questioning of a motorist detained pursuant to [a] routine traffic stop

does not necessarily constitute custodial interrogation for the purpose of ... *Miranda.*" *Wallace,* 724 P.2d at 673. In *Wallace,* we concluded that the pre-*Miranda* statement was admissible because the defendant was not in custody when he responded to the officer's question. We held that "the officer was conducting a general investigation of the accident, and his initial inquiry of 'What happened?' did not take place in a custodial setting." *Id.* at 674 (footnote omitted). We also cited *Miranda:* " 'General on-the-scene questioning as to facts surrounding a crime or general questioning of citizens in the fact-finding process is not affected by our holding.... In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' " *Id.* at 674 n. 8 (quoting *Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694, 725–26 (1966)).

### C.

In ruling on a motion to suppress a custodial statement, a trial court engages in both fact-finding and in application of the controlling law to the facts established by the evidence. *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987). "A court's findings of historical fact are entitled to deference by a reviewing court and *will not be overturned if supported by competent evidence in the record....* An ultimate conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings, however, is subject to correction by a reviewing court, as is a court's application of an erroneous legal standard to the facts of the case." *Id.* at 732–33 (emphasis added) (citations omitted).

After reviewing the record, we conclude that the trial court's findings are not supported by the evidence, and are therefore subject to correction on appeal be-

---

**8.** The defendant-driver's response was that "he was tired of people 'flipping him off.' " *Wallace,* 724 P.2d at 672.

**9.** The trial court made its ruling based on the officer's opinion that he did not intend to arrest

the defendant or deprive him of his liberty in any way. Because this is not a proper consideration in determining what constitutes a custodial setting, we reversed the trial court's ruling.

cause "the trial court's ultimate constitutional ruling cannot be squared with the court's evidentiary findings of fact." *Quezada*, 731 P.2d at 734. This case involved a trooper's general investigation of a traffic accident. The fact that the response in question was, by necessity, asked at the hospital rather than at the scene of the accident does not transform a general fact-finding question relating to a traffic investigation into a custodial setting.[10] In conducting the traffic investigation, the trooper was unable to obtain identification of the parties at the scene, because they had already been removed by ambulance.[11]

A number of specific facts presented here are pertinent to our conclusion. The defendant's mother was present when this question was asked by the trooper.[12] When the defendant declined to speak with him, Sandoval left. The defendant may not have been free to walk away, but this was due to the actions of medical personnel, not law enforcement authorities.[13] At the time of Sandoval's questioning, the trooper was investigating a traffic accident, and expected to charge the defendant for several traffic offenses.[14] After locating and identifying the defendant at the hospital, the trooper detected the odor of an alcoholic beverage on Milhollin's breath. Under these circumstances, it was appropriate that Sandoval also investigate for an alcohol-related traffic offense under Colorado's express consent statute.[15] However, the defendant

---

**10.** In *State v. Clappes*, 117 Wis.2d 277, 344 N.W.2d 141 (1984), the Wisconsin Supreme Court held that the defendant was not subject to custodial interrogation when officers questioned the defendant about a car accident while he was at the hospital being treated by hospital staff, and the officer's questions were about identification of parties and the circumstances. The court noted that the officer's questions were not part of "a custodial verbal search intended to lead to the defendant's self-incrimination." *Id.* at 287, 344 N.W.2d at 147.

**11.** See *Cummings v. State*, 27 Md.App. 361 at 374-75, 341 A.2d at 303 for a list of jurisdictions that have adopted this view. The Kansas Supreme Court held a setting to be non-custodial when an officer interviewed the defendant at the hospital while investigating a car accident and the defendant was suspected of driving under the influence, but was not arrested or otherwise taken into custody. *State v. Brunner*, 211 Kan. 596, 507 P.2d 233 (1973).

**12.** The North Dakota Supreme Court held that interrogation of a hospitalized motorist which led to *admission by the defendant that he was the driver* was not the product of a custodial investigation, and did not require a *Miranda* advisement for the following reasons: his detention at the hospital was on medical advice, not police action; questioning was pursuant to accident investigation; the officer did not transport the defendant to the hospital; and a friend and a nurse were both present during questioning. *State v. Fields*, 294 N.W.2d 404 (N.D.1980).

**13.** The Illinois Court of Appeals held that an officer's effort to obtain a hospitalized driver's consent to a blood test was not custodial interrogation, even though the odor of an alcoholic beverage on the defendant's breath led the officer to suspect that the driver had been under the influence of alcohol. *People v. Kenning*, 110 Ill.App.3d 679, 66 Ill.Dec. 424, 442 N.E.2d 1337 (1982). *See also People v. Romano*, 139 Ill.App.3d 999, 94 Ill.Dec. 28, 487 N.E.2d 785 (1985), *cert. denied*, (Ill. April 2, 1986) (Where questioning of driver at hospital by officers led to the defendant's statement that he was the driver and had been drinking prior to the accident, and "[i]mmediately following the questioning" the driver was advised of his *Miranda* rights, "the fact that the questioning occurred in the hospital did not require suppression of the statements." *Id.* at 1010–11, 94 Ill.Dec. at 36, 487 N.E.2d at 793).

**14.** The Montana Supreme Court held that when an investigating patrolman contacted the defendant in the emergency room and asked his name, date of birth, whether he was driving, what speed he was traveling, and whether he was willing to take a blood test, this did not create a custodial setting because the defendant was not in legal custody and there was no coercion. *State v. Lapp*, 202 Mont. 327, 658 P.2d 400 (1983).

**15.** The North Carolina Court of Appeals upheld as non-custodial an officer's questioning of a driver outside the emergency room after an accident. *State v. Gwaltney*, 31 N.C.App. 240, 228 S.E.2d 764, *cert. denied and appeal dismissed*, 291 N.C. 449, 230 S.E.2d 767 (1976). In *Gwaltney*, the investigating trooper traveled to the hospital to complete his investigation of a one-car accident. He asked the injured party for her license and registration and asked how the accident occurred. *Id.* 228 S.E.2d at 767. She explained that she had been driving and gave her version of the accident. *Id.* While talking with her, the trooper discovered that she was unsteady, her eyes were glassy, and she had the odor of an alcoholic beverage on her breath. At that point, he waited for her release from the hospital and then arrested her for driving under

was not charged with the alcohol-related felony offense of vehicular assault until seven weeks later.

A *Miranda* warning is required "[w]hen an individual is taken into custody, or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630 (emphasis added). This limitation to actions taken "by the authorities" is reflective of the policy and purpose of *Miranda:* to prevent "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445, 86 S.Ct. at 1612.

Other jurisdictions have held similar settings to be non-custodial. In fact, "the majority of cases have held that in-hospital questioning does not amount to custodial interrogation." *State v. Lapp*, 202 Mont. 327, 332, 658 P.2d 400, 403 (1983) (citing *Cummings v. State*, 27 Md.App. 361, 370–71, 341 A.2d 294, 301 (1975).[16] *See generally What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation*, 31 A.L.R.3d 565, 620–25 (1970).

In the case before us, the trooper testified that he did not know which of the "two occupants of the motorcycle" was the driver, and which was the passenger, until speaking to them at the hospital. Because he could not complete a traffic investigation without knowing who was the driver, this was the type of general question which could have been properly asked at the accident scene as part of "[g]eneral on-the-scene questioning as to facts" surrounding the accident. A statement in this context does not become violative of the fifth amendment simply because the question was asked at the hospital rather than at the scene of the accident. There is simply no evidence in the record to support the conclusion that the defendant, at the time he was asked whether he was the driver of the car, reasonably believed that his freedom of action had been curtailed by the officer to a degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 441–42, 104 S.Ct. 3138, 3151, 82 L.Ed. 2d 317 (1984).

After completing his on-the-scene investigation Sandoval drove to the hospital, where the staff directed him to the emergency room where the defendant was waiting for surgery. When he found the ward, Sandoval identified himself to Milhollin as the trooper investigating the accident at I–25 and 58th Avenue. Sandoval asked the defendant if he was the driver of the motorcycle; the defendant stated that he was. After verifying that Milhollin was the driver, the trooper immediately gave a *Miranda* advisement. Shortly thereafter, even though Milhollin had originally waived his *Miranda* rights, he exercised his right to remain silent and the interview was terminated.

There is no evidence in the record supporting the trial court's factual finding that "the officer made various demands, sometimes misleading." *Miranda* does not apply "unless the situation exerts upon a detained person pressures that significant-

---

the influence. The court held that a *Miranda* warning was not necessary because the questioning was necessary to complete the investigation and report, and was "investigatory and not accusatory." *Id.*

**16.** In *Cummings v. State*, 27 Md.App. 361, 341 A.2d 294 (1975), the defendant sought suppression of statements he made to an officer while he was in a hospital room being treated for injuries suffered in the car accident. The court held that being in the hospital alone did not create a custodial setting; the presence of friends or neutrals in the hospital room tended to establish that this was a non-custodial setting because it eliminated the element of coercion which is inherent when a defendant is isolated.

*Id.* at 381, 341 A.2d at 307. *See Miranda*, 384 U.S. at 449–450, 86 S.Ct. at 1615. A number of jurisdictions "have considered the presence of friends and relatives as indicative of non-custodial interrogation." *Cummings*, 27 Md.App. at 373, 341 A.2d at 303. Another factor was the lack of physical restraint; even though a defendant may be bedridden, this is "an internal circumstance and not an external restraint." *Id.* The absence of a formal charge or arrest, a guard, interference with the patient's freedom of movement in his hospital room, and the officer's friendly manner and neutral tone, were factors in determining that *Miranda* did not apply because the setting was non-custodial in nature. *Id.* at 373–75, 376–78, 341 A.2d at 303, 304–05.

ly impair his free exercise of his privilege against self-incrimination." *People v. Archuleta,* 719 P.2d 1091, 1092 (Colo.1986). *See, e.g., Jorgensen v. People,* 178 Colo. 8, 495 P.2d 1130 (1972) (When police asked the defendant his name and he responded "I'm the one you're looking for," this statement was held to be "non-custodial and voluntarily made, and therefore not subject to the *Miranda* requirements." *Id.* at 13, 495 P.2d at 1132.)

Based on the facts in the record before us, we conclude that this was not a custodial setting, and the statement should not have been suppressed. We reverse with instructions to admit the blood test results and the statement into evidence.

LOHR, J., concurs in part and dissents in part, and KIRSHBAUM, J., joins in the concurrence and dissent.

LOHR, Justice, concurring in part and dissenting in part:

The majority concludes that Trooper Sandoval was not required to advise the defendant of his *Miranda*[1] rights prior to questioning him in the hospital emergency room because the setting was not custodial. The majority therefore reverses the trial court's order suppressing the defendant's statement that he was the driver of the motorcycle even though the statement was made in response to the officer's question and prior to a *Miranda* advisement. I believe that the trial court's conclusion that the questioning took place in a custodial setting is fully supported by the evidence. I would therefore affirm the trial court's order suppressing the defendant's statement. I agree, however, with the majori-

ty's resolution of the blood alcohol test issue and join in the majority opinion as it relates to that matter.[2]

I.

The evidence on the basis of which the trial court made its findings was essentially consistent or uncontradicted and reflects the following events and circumstances. The defendant was one of two persons riding on a motorcycle at about 1:00 a.m. on October 25, 1986, when the motorcycle struck a car. Following the accident, the defendant was taken to a hospital. At the time of the interrogation at issue here, the defendant was in the emergency room being prepared for surgery. His mother was with him in the room. The defendant had broken his leg in the accident and was in severe pain, in part because the hospital staff could not administer pain relievers until the extent of the defendant's injuries was known. Trooper Sandoval of the Colorado State Patrol arrived at the emergency room shortly before 3:30 a.m. Sandoval identified himself to the defendant as the officer investigating the accident and, without administering *Miranda* warnings, asked the defendant if he was the driver of the motorcycle. The defendant stated that he was the driver, after which Sandoval advised the defendant of his *Miranda* rights. Sandoval testified that the defendant indicated that he wished to waive his *Miranda* rights and would answer questions without requiring that an attorney be present. However, when Sandoval asked the defendant to sign the advisement form, the defendant refused, saying, "why don't you wait until I'm halfway ...," but never

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Becuase I conclude that the trial court properly ruled that the defendant's statement that he was the driver of the motorcycle was obtained in violation of his *Miranda* rights, that statement cannot be used to establish probable cause to believe that the defendant was the driver. Under the circumstances here, however, because there were only two riders of the motorcycle, I would hold that probable cause existed as to each, at least for the purpose of determining whether a blood sample could be taken involuntarily under the standards of *Schmerber*

*v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *Cf. People v. Sutherland,* 683 P.2d 1192, 1196 (Colo.1984) ("where two persons each claimed the other was the driver of a vehicle involved in a suspected criminal offense, the officer had reasonable grounds to obtain a blood sample from each suspect"); *People v. Hearty,* 644 P.2d 302, 310 (Colo.1982) (rejecting "more probable than not" standard as constitutional measure of probable cause in context of issue as to location of evidence that was the object of a search pursuant to warrant). *See generally* 1 W. LaFave, *Search and Seizure* § 3.2(e) (2d ed. 1987).

completed the sentence. Sandoval testified that during the course of the questioning, he advised the defendant that he was under investigation for driving under the influence of alcohol, as well as for violation of a red signal light, speed contest, and reckless driving. The officer informed the defendant that he had the option of taking either a blood test or a breath test. Sandoval told the defendant that it was a requirement of the state that one of the tests be administered. The defendant elected a blood test, and a blood sample was taken by hospital personnel. The trial court found that the defendant was unable to terminate the interview or withdraw from the officer's presence.

## II.

In order to determine whether an individual is in police custody and therefore must be advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),[3] prior to questioning, a trial court must ascertain whether a reasonable person in the suspect's position would consider himself deprived of his freedom of action in any significant way. *People v. Sandoval*, 736 P.2d 1201, 1203 (Colo.1987). In making this determination, the court must examine the totality of the circumstances surrounding the interrogation, including the following factors:

[t]he time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*People v. Wallace*, 724 P.2d 670, 673 (Colo. 1986) (quoting *People v. Viduya*, 703 P.2d

1281, 1286 (Colo.1985)). *Accord, e.g., People v. Sandoval*, 736 P.2d 1201, 1203 (Colo. 1987).

When considering these factors, it is important to keep in mind the reasons why custody triggers the *Miranda* protections. The United States Supreme Court in *Miranda* was concerned with preserving a suspect's privilege against compulsory self-incrimination during interrogations by police officers. The privilege, grounded in the fifth amendment to the United States Constitution, guarantees that an accused will not be convicted by his own compelled statements. "[T]he privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Miranda v. Arizona*, 384 U.S. at 460, 86 S.Ct. at 1620 (quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964)). The Court in *Miranda* reasoned that custodial settings are coercive by their very nature and stated that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Miranda v. Arizona*, 384 U.S. at 458, 86 S.Ct. at 1619. The *Miranda* warnings were then adopted to provide the necessary protective devices.

A person who is not in custody is free to leave without answering the interrogator's questions. Custody, on the other hand, by its very nature exerts a pressure upon the suspect to answer whether he wants to or not. *See Miranda*, 384 U.S. at 457–458, 86 S.Ct. at 1619. The unspoken message is that he may not leave until he answers the questions. The purpose of the *Miranda* warnings is to alleviate the aura of coercion that would exist in an otherwise inherently coercive setting.

## III.

Due to his physical condition, the defendant could not leave the emergency room

---

**3.** *Miranda* substituted the "custodial interrogation" criterion for the "focus of the investigation" test earlier enunciated in *Escobedo v. Illinois*, 378 U.S. 478, 490–91, 84 S.Ct. 1758, 1765,

12 L.Ed.2d 977 (1964). *See People v. Viduya*, 703 P.2d 1281, 1287 (Colo.1985); *People v. Parada*, 188 Colo. 230, 233, 533 P.2d 1121, 1122 (1975).

and so was not physically free to terminate the interrogation by walking away.[4] For the defendant, the functional equivalent of physically leaving the interrogation setting was to cut off Sandoval's questioning. The question to be asked in this case therefore is whether a reasonable person in the defendant's position would have believed that he could have freely and effectively stopped Trooper Sandoval's interrogation and induced him to depart, so as to obviate the need for pre-interrogation *Miranda* warnings.[5]

The trial court reviewed the evidence and made findings of fact specifically related to the factors set forth in *People v. Viduya* for resolution of the custody issue. The court found that the interrogation took place in a hospital emergency room at approximately 3:30 a.m. The defendant was being treated for a broken leg and was in pain. The defendant's mother was with him at the hospital. The court found further that Trooper Sandoval came to the hospital to gather evidence from the defendant as a suspect, since Sandoval had with him advisement of rights forms. The court found that Sandoval identified himself to the defendant, said that he was investigating the accident, and then asked the defendant whether he was the driver of the motorcycle. The court found that while Sandoval's tone of voice was not abusive, he was in uniform and was persistent in his questioning. The court found further that while Sandoval did not restrain the defendant, the defendant was physically incapable of removing himself from the officer's presence or questioning. Based on these determinations, the court found that the defendant "was unable to terminate the interview or withdraw from the officer's presence," and that "a reasonable person in [d]efendant's position would have believed that he had been deprived of his liberty in a significant way."

The trial court's factual findings are fully supported by the evidence. The court explicitly applied the correct legal standard set forth in *People v. Viduya* in reaching the ultimate conclusion that the defendant was in custody. The application of the

---

**4.** A number of courts have considered whether a hospital is a custodial setting, with varying results. *See* Annotation, *What Constitutes Custodial Interrogation Within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 A.L.R.3d 565 (1970 & 1987 Supp.). The place of interrogation is only one of the many factors that make up the totality of the circumstances surrounding an interrogation. Therefore, a tallying of cases that have found a hospital environment to be custodial and those that have not is of little utility in determining whether a particular interrogation at a hospital is custodial.

The majority relies to some extent on the fact that the defendant's injuries and attendant immobility were not brought about by the officer or any other agent of the state, and seems to suggest that the defendant's physical condition is therefore irrelevant to a determination of custody. I cannot agree with this view. The critical inquiry in resolving the custody issue is whether a reasonable person in *the suspect's position* would consider himself deprived of his freedom of action in any significant way. This necessarily requires an evaluation of the interrelation of the officer's conduct and the individual's qualities and circumstances. *Cf. Miranda v. Arizona,* 384 U.S. at 457, 86 S.Ct. at 1618–19 (defendant's background as "a seriously disturbed individual with pronounced sexual fantasies" and another's background as "an indigent Los Angeles Negro who had dropped out of school in the sixth grade" are relevant to potentiality for compulsion).

**5.** In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court held that for the purpose of *Miranda,* a person temporarily detained on the basis of an ordinary traffic stop is not "in custody" during roadside questioning. *Accord People v. Wallace,* 724 P.2d 670 (Colo.1986); *People v. Archuleta,* 719 P.2d 1091 (Colo.1986). The United States Supreme Court concluded that in such a setting *Miranda* warnings need be given only when a motorist's freedom of action has been curtailed to a degree associated with formal arrest. *Berkemer v. McCarty,* 468 U.S. at 440, 104 S.Ct. at 3150. In reaching that conclusion the court relied on the facts that detention of a motorist pursuant to a routine traffic stop is presumptively temporary and brief and that the circumstances associated with the typical traffic stop are not such that the motorist feels at the mercy of the police. *Id.* at 437–38, 104 S.Ct. at 3149. These factors are no longer applicable when a motorist is later questioned about a traffic incident in some other setting, so the *Berkemer* analysis has limited relevance at most to the circumstances in the case now before us. We have previously declined to decide whether *Berkemer* applies to accident investigations under any circumstances. *People v. Viduya,* 703 P.2d at 1287–88 n. 8.

*Viduya* test by its very nature requires the exercise of discretion. Under these circumstances, I would not disturb the trial court's determination as to custody or its order suppressing the defendant's statement. *See People v. Quezada,* 731 P.2d 730, 732–33 (Colo.1987).

I am authorized to say that Justice KIRSHBAUM joins in this concurrence and dissent.